UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CAROL F.,[1]

                    Plaintiff,

v.                                          ACTION NO. 2:19cv155

ANDREW SAUL,
Commissioner of Social Security,

                    Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Carol F. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that Carol F.'s motion for summary judgment (ECF No. 11) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 13) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.

# I.   PROCEDURAL BACKGROUND

Carol F. ("plaintiff") protectively filed an application for disability insurance benefits on or about March 13, 2014, alleging she became disabled on April 5, 2010, due to arthritis, an elevated heart rate, depression, high blood pressure, vitamin D deficiency, high cholesterol, and allergies.[2]  R. 12, 59, 67, 185–86, 229.  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 59–83, 99–100.  ALJ Maryann Bright heard the matter on October 24, 2017, and issued a decision denying benefits on February 15, 2018.  R. 9–21, 26–58.  On February 4, 2019, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–5, 183–84.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed her complaint on March 29, 2019.  ECF No. 1.  The Commissioner answered on December 2, 2019.  ECF No. 9.  In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on January 2 and 31, 2020, respectively.  ECF Nos. 11–14.  Plaintiff filed a reply on February 12, 2020.  ECF No. 15.  The Court also permitted and received supplemental briefs, addressing new decisions from the district court and the Fourth Circuit.  ECF Nos. 19–21.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   *Background Information and Hearing Testimony by Plaintiff and Her Spouse*

As the sole issue presented concerns plaintiff's ability to maintain concentration, persistence, and pace, the facts set forth below pertain to that issue, rather than plaintiff's physical and other conditions.

Plaintiff was 51 years old as of the alleged onset date of disability of April 5, 2010. R. 59. After brief stints working as a certified nursing assistant, a cleaner, and for a mail order business in the late 1990s, plaintiff worked full-time as a data entry clerk for a newspaper and magazine business from 2000 until April 5, 2010. R. 208–09, 215, 238.

Plaintiff has two adult daughters and lives with her husband of over 21 years, who takes care of himself despite being on disability due to hip problems. R. 32–33. She completed the eighth grade. R. 34–35. Plaintiff testified that her inability to keep up with the work caused the loss of her job processing newspaper advertisements. R. 35–36. Plaintiff explained that she cannot work because she: has difficulties socializing and interacting with others; feels claustrophobic in crowded settings; lacks an ability to focus and concentrate on completing tasks; experiences racing thoughts; is easily stressed out; responds poorly to workplace criticism and mistakes; and suffers from arthritis in her hands, arm, knee, and back. R. 38, 44–46, 48–49. She testified to taking medications for mental health conditions, arthritis, blood pressure, and sleep problems. R. 39–40.

On a typical day plaintiff sits at home and watches television. R. 42. She reports having no problems with bathing or dressing and indicated that her cooking involves preparing only simple items, such as sandwiches and bowls of cereal. R. 42. She also cares for and feeds her dog, but does not take her on walks. R. 43 One of her daughters helps plaintiff with housecleaning and visits daily. R. 34, 42; *see* R. 44 (noting both children provide care to assist the couple).

3

Plaintiff advised that she prefers not to go out, but when she does, her husband or daughter drive. R. 34, 42. She goes grocery shopping with them about once a week. R. 42–43. Although she used to paint, plaintiff said she has no hobbies and does not have a computer. R. 43.

Plaintiff's spouse briefly testified and reiterated that she is easily stressed out and prone to getting upset and crying over small matters. R. 50. He advised that she cannot function like she used to and described, as indicative of a lack of focus or concentration, how she "drifts off" or "falls asleep" while watching television or sometimes gets "a strange look on her face" while conversing before taking "a second to catch up." R. 51.

On November 3, 2015, plaintiff and her prior attorney completed an adult function report. R. 256–63. In it, plaintiff claimed an inability to work due to "depression, back pain, left shoulder pain, right hip pain, asthma, obesity, and hypertension." R. 256. Due to these conditions, plaintiff reported having, among other things, "severe problems with maintaining focus and concentration," and needing "to lie down and rest a lot during the day" due to pain and depression. R. 256–57. Plaintiff also reported having difficulties with bathing and dressing. R. 257. She reported doing light chores at home, but only for brief periods of time. R. 258. Plaintiff indicated that she gave up driving sometime after 2003, and does not go out alone due to "depression and focus problems." R. 259. While able to pay bills, count change, and handle bank accounts, plaintiff advised these tasks were becoming "much harder . . . due to focus/depression." R. 259–60. She also checked boxes indicating her condition affected, among other things, completion of tasks, concentration, understanding, following instructions, and getting along with others. R. 261. Plaintiff reported moderate impairment in focus/concentration, following written and spoken instructions, and handling stress and changes in routine. R. 261–62. Plaintiff reported only mild impairment in getting along with persons in authority. R. 262.

4

**B.**     *Relevant Medical Record*

 *1.* *Treatment by Dr. Waldo Ellison*

Plaintiff received treatment from Waldo Ellison, M.D., at Dominion Psychiatric Associates on approximately 24 occasions from September 12, 2009, through November 30, 2012.  R. 293–94.  Most of the treatment reports address matters of medication management, with few other details.  R. 294–317.  The vast majority of reports specify no diagnoses.  R. 293.  The following diagnoses were, however, noted on the following dates:  (1) major depression, recurrent, on October 9, 2010; (2) attention deficit disorder without hyperactivity ("ADD") and major depression, recurrent, on June 25, 2011; (3) ADD on June 23, 2012; and (4) ADD and major depression, recurrent, on September 15 and November 30, 2012.  R. 293.

During her second visit, on December 5, 2009, plaintiff reported that her employer threatened to fire her absent improvement "with her focusing."  R. 316.  In response, Dr. Ellison prescribed Adderall, and continued her on Wellbutrin, Effexor, Geodon, and Xanax.  R. 316.  One week later, plaintiff told Dr. Ellison she felt "wonderful" and was "focused [and] motivated."  R. 315; *see* R. 313–16 (noting good results and increasing Adderall dosage from 10 to 30 mg.).  On approximately 11 occasions in quarterly visits from July 3, 2010 through November 30, 2012, treatment notes reflect that plaintiff was doing well on her medications and/or that she was "calm, focused, and on task."  R. 294–309.

 *2.* *Treatment at Western Tidewater Free Clinic*

Plaintiff also received treatment for mental and physical health conditions at the Western Tidewater Free Clinic from June 2013 to October 2015, typically at intervals ranging from one to three months.  R. 376, 390.  On June 27, 2013, an initial patient history found plaintiff to be "very tearful," with a reported history of depression, and noted she had been "off" her medications for

one month. R. 376. The provider prescribed Zoloft to treat depression. R. 376. On July 29, 2013, the provider increased the dosage from 50 to 100 mg. due to a lack of significant improvement. R. 375–76. On September 17, 2013, the provider prescribed citalopram to treat plaintiff's reported anxiety. R. 374.

On a January 16, 2014 visit, plaintiff complained, among other things, about anxiety and depression. R. 373. On March 18, 2014, plaintiff stated that she was "doing quite well" and was continued on citalopram. R. 371. When plaintiff complained of being very depressed on August 18, 2014, the provider prescribed the maximum dosage for citalopram and told her to return in two weeks to evaluate the results. R. 369. On September 5, 2014, plaintiff reported feeling better and that her depression was controlled. R. 368. On December 19, 2014, the provider prescribed Cymbalta. R. 366.

During a medication management visit on January 19, 2015, plaintiff stated that the Cymbalta "has helped some." R. 365. When seen on February 13, 2015, plaintiff advised that the Cymbalta was not helping and that she suffered from sadness and multiple family stressors. R. 364. When plaintiff reported continuing anxiety and depression on March 16, 2015, the provider suggested a mental health referral. R. 363. Treatment notes from June and July 2015 indicate plaintiff continued to complain of depression and was switched from one medication to another. R. 319–20. On September 1, 2015, plaintiff reported that she was not depressed, nervous, or anxious, and her provider assessed her mood and affect as normal. R. 386–87. A month later, plaintiff advised she was depressed, but the provider noted her mood and affect were normal. R. 388–90. On October 16, 2015, the provider's assessment remained the same and plaintiff reported no depression or anxiety. R. 390–92.

### 3.    *Treatment via the Western Tidewater Community Services Board*

Roughly one year after the date last insured, on October 20, 2016, plaintiff began receiving counselling and medication management through the Western Tidewater Community Services Board ("WTCSB"). R. 469–71. During intake, plaintiff reported a long history of depression and stated her current medication was no longer working. R. 469–70. Her reported symptoms included sadness, home isolation, bouts of crying, insomnia, and anger at her adult children. R. 470 (rating mood as "5/10"). A mental status exam found plaintiff fully oriented, with appearance, speech, thought processes and content, memory, and insight all within normal limits; but with a constricted affect and depressed mood. R. 471. The WTCSB providers recommended, among other things, outpatient therapy and switching from citalopram to Zoloft. R. 469, 471. Treatment notes from November 17, 2016 contained similar mental status exam results, noted that plaintiff mistakenly took and ran out of Zoloft while tapering off the prior medication, and showed no improvement. R. 465–66; *see also* R. 456–59 (rating mood as "7–8/10" on December 15, 2016, discontinuing Zoloft and prescribing Abilify, and noting diagnosis of "Bipolar II disorder"), 458, 462 (reporting no improvement and similar mental status exam results for December 15, 2016 and January 12, 2017 visits).

When seen on January 26, 2017, plaintiff noted difficulties sleeping due to sleep apnea and that a recent increase in her Abilify dosage led to "no change in sadness or crying." R. 454. Treatment notes for this visit listed plaintiff's mood as "8/10," but also indicated the absence of improvement "with Paxil, Celexa, Zoloft . . . , Wellbutrin[,] and now Abilify." R. 454. On February 23, 2017, plaintiff advised the check-in nurse that she felt well, but told the physician's assistant that she cried "every day all day" and felt "very stressed emotionally." R. 450–51 (noting also attendance at two therapy appointments). At check-in on March 9, 2017, plaintiff again

7

reported feeling well and stated she needed to get back home to her sick grandson, and later told the physician's assistant that she was "no longer crying daily" and was sleeping much better. R. 446–47 (noting mood as "7–8/10," current use of Latuda, and prior failed trials of Abilify, Seroquel, Celexa, Wellbutrin, Paxil, and Zoloft); *see* R. 440.

On March 24, 2017, plaintiff began cognitive behavioral therapy at the WTCSB to manage symptoms of bipolar disorder, anxiety, and depression. R. 442–43. On April 14, 2017, plaintiff told her counselor she felt good and exhibited an "upbeat mood," but was tired due to babysitting. R. 442. On May 24, 2017, plaintiff presented with an upbeat mood, was excited about an upcoming beach trip, and was reflective in discussing the impact of events in her life. R. 436.

When seen for medication management on June 8, 2017, plaintiff presented with increased symptoms of depression, described feeling sad and frequently tearful, and reported needing to borrow money to deal with significant financial stressors, including car trouble. R. 433–34 (listing mood as "4/10" and increasing dosage of Latuda from 20 to 30 mg.); *see* R. 432 (reporting similar issues to counselor on June 9, 2017). On July 13, 2017, plaintiff reported that her condition had improved with an increased dosage of Latuda, before her supply ran out, and she was given new samples. R. 426–27. When counseled on July 14, 2017, plaintiff attributed an increase in her symptoms due to delayed delivery of medications. R. 425. On July 28, 2017, plaintiff and the counselor discussed using relaxation techniques to mitigate anxiety arising from her and her spouse's physical health concerns. R. 424.

During a September 2017 quarterly treatment review, the counselor observed that plaintiff continued to experience symptoms of anxiety and depression due to financial and/or family stressors, but that she "has begun to master relaxation techniques" to address those symptoms. R. 420–22 (also noting work towards "conflict resolution strategies"); *see* R. 419, 423. During

medication management and therapy appointments in September and October 2017, plaintiff continued to report similar symptoms of depression and anxiety due to the same stressors, and an upcoming social security disability hearing. R. 401–02 (noting also she rated "her mood as 7/10"), 411 (weaning off Latuda before prescribing new medication), 413, 415–17 (noting no change with increased Latuda dosage).

### 4.   *Consultative Examinations and State Agency Physician Reviews*

On October 7, 2011, Kathleen Dring, Psy.D., conducted a psychological consultative examination.[3] R. 281–86. Dr. Dring reviewed plaintiff's educational background,[4] family history, legal history,[5] employment, medical history,[6] substance abuse history, emotional illness history, and a June 25, 2011 report from Dr. Ellison listing plaintiff's prescriptions and the diagnoses noted above. R. 282–84. Plaintiff told Dr. Dring that she was unable to work, as she could not focus upon and complete job tasks due to ADHD and depression. R. 283 (describing problems in sustaining attention, listening to others, organizing, remembering, fidgeting, controlling impulsive behavior, maintaining energy and interest, and avoiding feelings of sadness and irritability).

Dr. Dring's mental status exam found plaintiff: (1) alert and fully oriented; (2) cooperative,

---

[3] Plaintiff came to the examination alone and told Dr. Dring that she drove herself roughly three miles to the appointment. R. 281. Before the ALJ, plaintiff testified that she lost her license in 2005 and that her husband and daughter assisted her in getting around. R. 33–34; *see* R. 259, 263 (noting, on November 3, 2015, that she gave up driving after brain surgery in 2003).

[4] Plaintiff told Dr. Dring that she left school in the eighth grade because she liked "'to party more than . . . to go to school.'" R. 281. Before the ALJ, plaintiff testified that she dropped out of school at that time due to pregnancy. R. 35.

[5] Plaintiff reported a prior 1986 felony conviction for making "fraudulent statements to social services in order to collect welfare benefits." R. 282.

[6] This medical history included a 2006 neurosurgery due to an ear infection that had spread to the brain, a 2009 hysterectomy, and a 1998 knee surgery. R. 282.

pleasant, and occasionally tearful when describing financial stressors; (3) exhibiting a labile and depressed affect; (4) having some psychomotor agitation, as evidenced by jiggling her feet; (5) exhibiting generally coherent, logical, and goal-directed thinking; (6) with sufficient intelligence and fund of information; and (7) with adequate insight and awareness of her illness. R. 284–85. Although plaintiff inaccurately repeated a sentence spoken to her, Dr. Dring also found that she could immediately recall several objects and, after a delay, also recalled two out of three objects. R. 285. Plaintiff also could spell a five-letter word backwards. R. 285. Dr. Dring concluded that plaintiff had no significant memory problems and was able to engage in abstract reasoning. R. 285.

Dr. Dring diagnosed plaintiff with a major depressive disorder, recurrent, moderate; attention deficit/hyperactivity disorder ("ADHD"), combined type; alcohol dependence in sustained remission; cannabis abuse in sustained remission; and noted the existence of antisocial personality traits. R. 285. Assessing plaintiff's functional abilities, Dr. Dring concluded that she: (1) could perform simple and repetitive tasks and would have only minor difficulty performing detailed and complex tasks due to depression and ADHD; (2) could regularly maintain attendance and consistently work; (3) needed no additional or special supervision, but would encounter mild problems in accepting instruction due to depression and ADHD; (4) could complete a normal workday and workweek without interruptions; and (5) would encounter mild difficulty interacting with the public and coworkers in a competitive workplace due to her mental health conditions. R. 285–86.

Dr. Dring summarized her findings, noting that, according to Dr. Ellison's notes, plaintiff's ADHD was relatively well-controlled by medication, and that it would not significantly interfere with her performance of work activities. R. 286. Dr. Dring also noted that, although plaintiff's

depression was only somewhat controlled by medications and she continued to have symptoms, it was "highly likely that if she had [] effective and consistent psychotherapeutic interventions her major depressive disorder would be significantly decreased." *Id.*

On August 19, 2015, Timothy Lee, M.D., M.S., performed a consultative physical examination. R. 379–82. With respect to plaintiff's mental status, Dr. Lee found plaintiff to be fully alert and oriented, with thought content and recent and remote memory grossly intact, an appropriate general fund of knowledge, and a flat affect and a depressed mood. R. 381 (noting plaintiff reported that she could read, write, and "do basic math").

On September 8, 2015, Richard Luck, Ph.D., a state agency psychologist, reviewed the record relating to plaintiff's mental health impairments and concluded that they were not severe.[7] R. 63–64 (noting no difficulties in maintaining concentration, persistence, or pace).

On September 10, 2015, Luc Vihn, M.D., a state agency physician reviewed the record relating to plaintiff's physical conditions and "suggest[ed]" that they be classified as not severe. R. 62–63. On November 12, 2015, James Wickham, M.D., another state agency physician, reached the same conclusion. R. 74.

On reconsideration on January 6, 2016, William Carne, Ph.D, another state agency psychologist reviewed the medical evidence concerning plaintiff's mental impairments, and found moderate limitations in activities of daily living, in understanding and memory, in social interaction, in adaptation, and in maintaining concentration, persistence, or pace. R. 75–80. Nevertheless, Dr. Carne concluded plaintiff could perform simple, routine tasks. R. 76. Dr.

---

[7] Dr. Luck's explanation notes that plaintiff's records "show mild depressive complaints with no significant treatment outside of medications through her [primary care physician]." R. 63. It is not apparent why he failed to address plaintiff's treatment at Dominion Psychiatric Associates. *See* R. 61.

Carne's explanation indicates among other things, that plaintiff is

> able to read/write/do basic math . . . , needs no reminders for
> personal needs/meds, can handle finances, can pay attention;
> however, she cannot go out alone due to depression/focus problems,
> does not shop, is not social, has problems getting along with others,
> has problems following instructions, has problems handling
> stress/changes in routine.

R. 75–76; *see also* R. 78–80.

## C.   *Hearing Testimony of Vocational Expert Linda Augins*

Linda Augins, a vocational expert ("VE"), testified at the hearing before the ALJ.  R. 52–58.  VE Augins initially testified that a hypothetical person who, among other functional limitations, could not engage in complex tasks and was limited to simple, routine, and repetitive tasks consistent with unskilled work, could not return to the semi-skilled work plaintiff performed as a data entry clerk.  R. 53.

VE Augins also responded to a series of hypothetical questions posed by the ALJ.  R. 53–56.  The ALJ inquired, among other things, about the existence of jobs in the national economy for a hypothetical person:  (1) capable of a medium level of exertion; (2) who could frequently balance, stoop, crouch, kneel, crawl, and climb ramps and stairs; (3) who could occasionally climb ladders, ropes, and scaffolds; (4) who needs to avoid concentrated exposure to extreme cold or heat, wetness, humidity, slippery and wet surfaces, unprotected heights, respiratory irritants, and poorly ventilated areas; (5) who could perform simple, routine, and repetitive tasks consistent with unskilled work, during a normal workday and workweek, with customary breaks; (6) who is limited to low stress work, defined as requiring occasional decision-making and changes in work setting; (7) who could only engage in superficial interactions with supervisors, coworkers, and the public, defined as occasional and casual contact without prolonged conversation or discussion of involved issues; and (8) who could have supervisory contact, involving the provision of necessary

12

instruction. R. 53–56. Based upon these factors, VE Augins testified that such a person could work as a store laborer, an office cleaner, and a hand packager, and that such jobs existed in the national economy. R. 53–55.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[8] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 17–24.

The ALJ found that plaintiff met the insured requirements[9] of the Social Security Act through September 30, 2015, and had not engaged in substantial gainful activity from April 5, 2010, her alleged onset date of disability. R. 14.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) degenerative disc disease; (b) spondylosis; (c) obesity; (d) major depressive disorder; and (e) ADHD. R. 14. The ALJ classified any additional impairments as non-severe, as they were

---

[8] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a)  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[9] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

controlled by medication or failed to significantly limit plaintiff's ability to engage in basic work activities. R. 14. The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 14–16.

The ALJ next found that plaintiff possessed the residual functional capacity ("RFC") to perform medium work, *see* 20 C.F.R. § 404.1567(c), subject to the limitations that she: (a) can "frequently balance, stoop, crouch, kneel, crawl, and climb ramps and stairs"; (b) can "occasionally climb ladders, ropes, and scaffolds"; (c) has "to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, hazards of wet, slippery surfaces and unprotected heights, [] respiratory irritants . . . and poorly ventilated areas"; (d) "could perform simple, routine and repetitive tasks consistent with unskilled work"; (e) could "sustain and attend to tasks throughout a normal workday and work week, with customary breaks"; (f) is "limited to low stress work" requiring only occasional decision-making and changes in work setting; (g) "could have superficial interaction with supervisors, coworkers, and the public," meaning "occasional and casual contact not involving prolonged conversation or discussion of involved issues"; and (h) "could have contact with supervisors that involved necessary instruction." R. 17.

Based upon this RFC, the ALJ found at step four that plaintiff could not resume working as a data entry clerk. R. 20. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs, such as a store laborer, an officer cleaner, and a hand packager, which existed in significant numbers in the national economy. R. 21.

14

Accordingly, the ALJ concluded plaintiff was not disabled from April 5, 2010 through the date last insured of September 30, 2015, and was ineligible for a period of disability or DIB. R. 21.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829

F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus,

reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial

evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829

F.2d at 517.

## V.     ANALYSIS

**A.     *The ALJ adequately reviewed the record and explained why, in spite of her limitations, plaintiff could perform and sustain work on a daily and weekly basis.***

Plaintiff relies upon the Fourth Circuit's decision in *Mascio v. Colvin*, 780 F.3d 632 (4th

Cir. 2015), and argues that a remand is required because the ALJ's RFC assessment fails to address

limitations stemming from her inability to persist and maintain pace while working. Pl.'s Br. in

Supp. Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 12 at 7–8. Plaintiff concedes that a series of

decisions by this Court have found that an RFC that restricts a claimant to simple, unskilled work

in two-hour increments, followed by breaks, accounts for pace and persistence limitations. *See,*

*e.g, Olsen v. Berryhill*, No. 3:18cv124, 2019 WL 407469, at *11–13 (E.D. Va. Jan. 16, 2019),

*adopted by* 2019 WL 404982 (E.D. Va. Jan. 31, 2019). Plaintiff contends, however, that two

Fourth Circuit decisions foreclose continued reliance on such cases, by finding that similar

restrictions to work performed at a non-production rate or pace too vague and ill-defined to permit

judicial review. Pl.'s Mem. 9–10; *see Perry v. Berryhill*, 765 F. App'x 869 (4th Cir. 2019); *Thomas*

*v. Berryhill*, 916 F.3d 307 (4th Cir. 2019). Moreover, plaintiff notes that other courts have ruled

that limitations restricting a claimant to work in two-hour increments fail to account for persistence

and pace limitations. Pl.'s Reply Br. ("Pl.'s Reply"), ECF No. 15 at 4–5.

The Commissioner argues that remand is neither necessary nor required because the ALJ

fully reviewed the record and explained why plaintiff's moderate concentration, persistence, and

pace limitations would not prevent her from working, subject to the limitations identified by the

ALJ. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 14 at 15–19. The Commissioner also argues that the Fourth Circuit's rulings in *Perry* and *Thomas,* in addressing limitations to work at a non-production pace or rate, have no bearing here because the ALJ's RFC assessment contains neither those terms nor others that are undefined. Def.'s Mem. 20–21. Having considered the parties' contentions, the Court finds that the ALJ satisfied the requirements of *Mascio* for the reasons set forth below.

As part of the five-step sequential analysis, an ALJ must determine a claimant's residual functional capacity, or RFC. *See* 20 C.F.R. § 404.1545. The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis in original). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* In determining a claimant's RFC, the ALJ must consider all relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3).[10] The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). *Id.* at § 404.1545(a)(5).

---

[10] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

In *Mascio*, the Fourth Circuit clarified the requirements of SSR 96-8p, holding that an ALJ fails to account for a claimant's moderate limitations in concentration, persistence, or pace by limiting the RFC to simple or routine tasks, or unskilled work. *Mascio*, 780 F.3d at 638. The Fourth Circuit observed that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638.

The ALJ's ruling in *Mascio* overlooked discussing the conflicting evidence about the claimant's ability to engage in certain functions during an entire workday. *Id.* at 637. Although declining to adopt a *per se* rule for remand whenever an ALJ fails to address the ability to stay on task, the court highlighted the need for the ALJ to engage in sufficient analysis, as a predicate for judicial review of the ALJ's conclusions. *Id.* at 636–37 ("Here, the ALJ has determined what functions he believes Mascio can perform, but his opinion is sorely lacking in the analysis needed for us to review meaningfully those conclusions. In particular, although the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday."). Thus, if an ALJ explains why moderate deficits in concentrating, persisting, or keeping pace do not necessitate additional limitations in a claimant's RFC, no remand is needed if the explanation adequately addresses why such deficits do not affect a claimant's ability to work. *Id.* at 638.

A recent decision by the Fourth Circuit demonstrates this point. In *Shinaberry v. Saul*, 952 F.3d 113, 120–21 (4th Cir. 2020), the court again addressed a claim that the ALJ failed to account for limitations in concentration, persistence, or pace when formulating the RFC and in questioning the VE. The court reiterated that *Mascio* "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific

limitation in the RFC." *Shinaberry*, 952 F.3d at 121. Instead, the court emphasized that the pertinent inquiry is case-centric and requires review of whether the ALJ supplied an adequate explanation for the absence of any such limitation in the claimant's RFC or the hypothetical. *Id.* (noting, for example, that "[h]ypothetical questions" posed to the VE may "otherwise implicitly account for [such] limitations") (citation and internal quotation marks omitted). In *Shinaberry*, the court found that the ALJ's review and discussion of the pertinent evidence "sufficiently explained why the mental limitation to simple, routine, and repetitive tasks accounted for Shinaberry's borderline intellectual disability and her moderate limitations in . . . concentration, persistence[,] or pace." *Id.* at 121–22.

The court reached this conclusion when the sole limitation directed to Shinaberry's mental impairment was the ALJ's condition for jobs requiring performance of only simple, routine, and repetitive tasks. *Id.* at 120. Thus, *Shinaberry* undercuts plaintiff's assertion—akin to the categorical rule rejected by *Mascio*—that the alleged absence of a restriction directed to the pace at which plaintiff can perform tasks during the two-hour time blocs identified by the ALJ requires a remand. Pl.'s Mem. 8.

At step three of her analysis, the ALJ used the paragraph B criteria to review plaintiff's mental functional capacities and determined that she was moderately limited in concentrating, persisting, or maintaining pace. R. 15–16 (also examining her abilities to process information, interact with others, and adapt and manage herself). The ALJ then undertook the "more detailed" "mental [RFC] assessment used at steps 4 and 5." R. 16.

In doing so, and as part of her overall RFC assessment, the ALJ extensively discussed and considered: (1) plaintiff's physical and mental health conditions; (2) her symptoms; (3) the hearing testimony of plaintiff and her spouse; (4) plaintiff's educational background and work history; (5)

her activities of daily living, family situation, and function reports; (6) her body mass; (7) the response of her conditions to medication and treatment; and (8) the medical and other evidence, including opinion evidence, in the record. R. 17–19. With respect to exertional abilities, the ALJ concluded that, notwithstanding her claimed inability to work, her allegations of arthritis, back pain, left shoulder pain, right hip pain, asthma, and hypertension, and her severe impairments of degenerative disc disease, obesity, and spondylosis, plaintiff retained "the ability to perform a range of medium work."[11] R. 17–18.

Notably, the ALJ also found that plaintiff's statements about her symptoms, and their limiting and work precluding effects, were "not entirely consistent with the medical evidence and other evidence in the record." R. 18. For example, the ALJ observed that imaging of plaintiff's lumbar spine showed "'quite mild' degenerative changes," notwithstanding her reports of low back pain. R. 18. Further, and in spite of plaintiff's September 2015 report of back and joint pain, the ALJ noted that she exhibited "normal gait, posture, station, and ranges of motion" when examined. R. 18; *see also* R. 387 (exhibiting normal range of motion in another exam in September 2015).

Turning to plaintiff's mental conditions, the ALJ observed that, while her depression and ADHD impacted her ability to perform work-related activities, her symptoms were "largely controlled" by medications. R. 18. For example, plaintiff regularly received treatment for three years from Dr. Ellison at Dominion Psychiatric Associates. R. 293. As noted by the ALJ, the treatment notes consistently state that plaintiff was "doing well with her medication and was calm, focused, and on task." R. 18–19, 294–309; *see also* R. 315 (noting that plaintiff told Dr. Ellison she felt "wonderful" and was "focused [and] motivated" after beginning to take Adderall).

---

[11] Plaintiff does not contest the ALJ's determination that she could perform work "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

The ALJ next addressed Dr. Dring's consultative mental health exam and her conclusion that, because plaintiff's ADHD responded well to medication, it "would not significantly interfere with her ability to perform job-related activities." R. 19.   The ALJ also noted Dr. Dring's assessment that plaintiff's depression was "somewhat controlled by medication," and her ongoing symptoms would likely respond well to psychotherapeutic treatment.[12]  R. 19.   Notwithstanding that plaintiff apparently received no psychotherapy in the following 12 months, the ALJ observed that plaintiff continued to do well while receiving medication and treatment from Dr. Ellison, and remained "calm, focused, and on task." R. 19.

In assessing functional abilities, Dr. Dring concluded plaintiff could perform simple and repetitive tasks, as well as detailed and complex ones; but would have minor difficulty with the latter due to her conditions. R. 285; *see* R. 15 (noting also Dr. Dring found that plaintiff was able to engage in abstract reasoning and lacked significant memory problems).  She also concluded that plaintiff could regularly attend and perform work, without particularized supervision and without interruptions stemming from her conditions. R. 285–86.  Finally, Dr. Dring concluded plaintiff would have mild problems accepting supervisory instruction, interacting with coworkers and the public, and dealing with workplace stress. R. 286.  Although finding these opinions "consistent with the evidence of record," the ALJ opted to give plaintiff "the benefit of the doubt," and assessed her as "more than only mildly restricted." R. 19–20.

In reviewing plaintiff's treatment record after November 2012, the ALJ re-emphasized the importance of medication in managing her conditions. R. 19.  For example, when starting

---

[12] After her date last insured, plaintiff participated in roughly a half-dozen therapy sessions from March to October 2017. R. 413–22.  Notes from these sessions offer some support for Dr. Dring's opinion about the benefits of therapy.  R. 422 (beginning to master relaxation techniques and working on conflict resolution), 424 ("employing relaxation techniques to assist with anxiety"), 436 (noting upbeat mood), 442 (noting upbeat mood).

treatment at the Western Tidewater Free Clinic, plaintiff was "tearful" at a time when she had run out of her depression medication, citalopram, a month earlier. R. 19, 376. By March 18, 2014, plaintiff reported that she was "doing quite well."[13] R. 371.

The ALJ also observed that, although plaintiff reported encountering financial and family stressors impacting her progress in treatment, she also played a role in caring for a disabled husband and a grandson with autism. R. 19; *see also* R. 442 (reporting fatigue due to babysitting). In response to plaintiff's reports of depression and anxiety due to such factors, the ALJ observed that clinic providers changed her medication and dosage. R. 19, 319–20, 366, 369, 374–76. Notwithstanding plaintiff's reports of depression on some occasions, the ALJ noted that providers sometimes assessed her as presenting with a normal mood and affect. R. 19, 387 (reporting no depression and normal mood and affect), R. 389–90 (reporting depression, but assessed with normal mood and affect).

Similarly, the ALJ observed a dichotomy between plaintiff's self-reporting about problems in following written and spoken instructions and observations made during consultative and other regular, mental status examinations from October 2016 through October 2017. R. 15, 19. Such examinations revealed that plaintiff exhibited "normal thought processes, thought content, and memory," even when presenting with a depressed and/or anxious mood. R. 15, 19, 284; *see also* R. 15 (noting finding that plaintiff exhibited coherent, logical, and goal-directed thinking). While ultimately giving plaintiff the benefit of the doubt when later fashioning limitations in the RFC, the ALJ also simultaneously found that "treatment notes do not sustain the claimant's allegations of disabling . . . limitations from" her physical and mental health conditions. R. 19–20.

---

[13] Later, and after the date last insured, plaintiff herself similarly attributed her worsening symptoms to the fact that she had run out of medications due to delivery delays. R. 425–27 (also reporting improvement on Latuda before her supply ran out).

The ALJ also weighed the opinions of the state agency mental health psychologists, giving great weight to those from Dr. Carne on reconsideration, and less weight to the initial opinion rendered by Dr. Luck. R. 19. Significantly, while finding plaintiff moderately restricted in mental functioning, Dr. Carne also found that plaintiff can read, write, perform basic math calculations, manage finances and medications, and retained some ability to pay attention, remember and follow simple instructions, request assistance, and make simple decisions. R. 75–76, 78–80. His explanation further identifies plaintiff's problems as going out alone due to depression and a lack of focus, socializing and getting along with others, following and remembering more detailed instructions, and dealing with stress and changes in routine. R. 75–76, 78–80.

The record demonstrates that, consistent with Fourth Circuit precedent, the ALJ both discussed and took the foregoing into account in fashioning the RFC and questioning the VE. Having found that plaintiff's self-assessment of her physical and mental health conditions and their effects failed to fully align with the evidence of record, that her mental health conditions generally responded well to medication (in spite of periodic difficulties prompted by life stressors), and in electing to give the benefit of the doubt in assessing plaintiff as "more than only mildly restricted," the ALJ reasonably concluded she "experience[s] some . . . limitation, but only to the extent described in the [RFC]." R. 20. She determined, among other things, that plaintiff: (1) could perform only "simple, routine and repetitive tasks consistent with unskilled work"; (2) could "sustain and attend to tasks throughout a normal workday and work week," provided she receives "customary breaks"; (3) was "limited to low stress work, defined as occasional decision-making required and occasional changes in work setting"; and (4) could engage in superficial interaction with supervisors, coworkers, and the public, limited to "occasional and casual contact not

23

involving prolonged conversation or discussion of involved issues," and including receipt of "necessary [supervisory] instruction." R. 17.

In addition to discussing the record and identifying factors of significance to her RFC assessment, the ALJ appropriately accounted for plaintiff's ability to stay on task. Unlike in *Mascio* and *Thomas*, the ALJ explicitly concluded that, with limitations directed to the type of work, the nature of tasks to be performed, the workplace setting and the frequency of changes therein, the extent of decision-making, the processing of information, the degree of interaction with others, plaintiff could work an entire workday and work week, with customary breaks. R. 17; *see* SSR 96-8p at *2 (noting that the RFC describes one's ability to work "on a regular and continuing basis . . . 8 hours a day . . . 5 days a week").

As conceded by plaintiff, the limitation to working with "customary breaks" means work performed in two-hour increments, followed by morning and afternoon rest breaks, and a lunch break. Pl.'s Mem. 8; *see* SSR 96-9p, 1996 WL 374185, at *6 (describing an 8-hour workday with a morning and afternoon breaks and a lunch break, at 2-hour intervals); *see, e.g., Fender v. Berryhill*, No. 1:17cv41, 2018 WL 1536485, at *7 (W.D.N.C. Mar. 29, 2018) (finding "a two-hour limitation directly addresses plaintiff's moderate limitations in concentration, persistence or pace"). Unlike the undefined limitations to non-production rate or pace work without a regulatory analog or fixed understanding in case law that the Fourth Circuit found insufficient in *Thomas* and *Perry*, the ALJ selected a limitation that is readily understood and easily applied. *Cf. Perry*, 765 F. App'x at 872 (noting absence of case law or analogous regulatory definition for "non-production oriented work setting" created "uncertain[ty]" inimical to judicial review); *Thomas*, 916 F.3d at 312 (noting limitation to work not "requiring a production rate or demand pace" was insufficiently "common enough" for the court to know what the ALJ meant, without further elaboration).

24

Although the limitation to two-hour time blocs imposed by the ALJ shares some resemblance to a limitation to non-production pace work, *see Fender*, 2018 WL 1536485, at *7, the Court rejects plaintiff's argument that this resemblance requires a remand, as in *Thomas* and *Perry*.[14] Pl.'s Mem. 9–10. As noted above, it was not the fact of the limitation to non-production rate or pace work that required a remand in those cases, but rather the vague and ill-defined use of such terms that frustrated judicial review. *See also Xavier S. v. Saul*, No. 1:19cv1195, 2020WL 1015816 (E.D. Va. Mar. 2, 2020) (same). The Fourth Circuit confirmed this not only in *Shinaberry*, but also in *Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017). In *Sizemore*, the court ruled that a limitation to work in "low stress non-production jobs with no public contact" and the performance of "simple one, two-step tasks," adequately accounted for the claimant's difficulties in concentrating, persisting, or keeping pace, when appropriately explained and contextualized. *Id.*; *see Perry*, 765 F. App'x at 872 n.1 (noting "the ALJ in *Sizemore* provided additional context" and included "descriptors" such as "without any 'fast-paced work' or 'public contact' . . . . to explain the restriction intended"). Accordingly, neither *Perry* nor *Thomas* precludes the use of limitations restricting a claimant to unskilled work, involving simple tasks, in two-hour time blocs.

---

[14] Although relying on the resemblance to argue for a remand, plaintiff simultaneously implicitly disclaims that resemblance in also arguing that a restriction to working in two-hour time blocs is no restriction at all, because that is a typical workday. Pl.'s Reply 3–5. The response to this argument is two-fold. First, in *Perry*, the Fourth Circuit explicitly described the term "non-production" as a "restriction." 765 F. App'x at 872 n.1. Thus, no great leap is required to apply that label to the term plaintiff characterizes as its "functional equivalent." Pl.'s Mem. 9. Second, and more importantly, the use of such labels obscures the fact that, in deciding plaintiff possessed an RFC for work under certain circumstances in two-hour time blocs each day of the work week, the ALJ was simply determining the most that plaintiff could do in a work setting, in spite of her limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2.

Finally, the Court also rejects plaintiff's contention that the ALJ's limitation regarding work performed in two-hour blocs fails to account for limitations in the pace at which she could perform work during such blocs and throughout the workday and work week. Pl.'s Reply 3–5. As noted above, not only does the record contain little evidence supporting the need for restrictions beyond those adopted by the ALJ, but plaintiff also fails to identify such evidence. As noted by the ALJ, the medical record shows that, when properly medicated, plaintiff did well and remained focused and on task for long time periods. To the extent that plaintiff's self-reporting is at odds with the foregoing, the ALJ adequately explained why she decided not to fully credit the same.

Plaintiff correctly notes that district courts have disagreed over whether a restriction to specific types of work and tasks for fixed periods of time, such as two hours, accounts for moderate limitations in concentration, persistence, or pace. *Compare Olsen*, 2019 WL 407469, at *12–13 (compiling cases concluding that a two-hour time bloc is a suitable proxy for such limitations), *with Jody R-S v. Berryhill*, No. TJS-18-1715, 2019 WL 1493364, at *3 (D. Md. Apr. 3, 2019) (explaining that an RFC that limits a claimant to work for certain time increments does not account for such limitations). This Court favors the former approach over the latter and notes that some of the latter cases can be factually distinguished. For example, the ALJ in *Jody R-S* failed to address whether the claimant could sustain the ability to perform work in two-hour blocks during an entire work week and similarly failed to explain how the claimant's part-time work noted by the ALJ translated into an ability to work full-time. 2019 WL 1493364, at *3–4. Further, to the extent that Plaintiff argues that other cases falling in the latter category dictate that a two-hour limitation will never account for moderate pace limitations, *see Steele v. Commissioner*, No. MJG-15-1725, 2016 WL 1427014, at *4 (D. Md. Apr. 11, 2016), such an approach conflicts with the non-categorical, case-centric approach that the Fourth Circuit recently utilized in *Shinaberry*. 952 F.3d at 121–22.

Because the ALJ here reviewed and discussed the record and appropriately accounted for plaintiff's limitations in the RFC, the Court rejects plaintiff's claim of error.

## VI.    **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 11) be **DENIED** and the Commissioner's motion for summary judgment (ECF No. 13) be **GRANTED**.

## VII.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 9, 2020